IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

RONNIE MALATESTA SALES, LLC                                PLAINTIFF

v.                                          CIVIL ACTION NO. 3:24-cv-00019-SA-JMV

HEY DUDE, INC.                                             DEFENDANT

ORDER AND MEMORANDUM OPINION

On January 12, 2024, Ronnie Malatesta Sales, LLC ("RMS") initiated this civil action by filing its Complaint [1] against Hey Dude, Inc.[1] The First Amended Complaint [39] was filed on October 14, 2024 and brings state law claims for breach of contract, failure to pay commissions, breach of the implied duty of good faith, and tortious breach of contract. Before the Court are Hey Dude's Partial Motion to Dismiss [46] and Motion for Summary Judgment [73]. The Motions [46, 73] have been fully briefed and are now ripe for review. The Court is prepared to rule.

*Relevant Background*

This action is a contractual dispute between RMS and Hey Dude as to sales commission allegedly owed to RMS for the year 2022. RMS is an independent sales agency in the business of selling products of manufacturers and importers in the footwear industry on a commission basis. Lucky Top, Inc. retained RMS as an independent sales representative to market and sell its line of footwear within a designated territory including Arkansas, Louisiana, Oklahoma and Texas. On August 3, 2021, Lucky Top, Inc. and RMS entered into a Sales Representative Agreement ("SRA"), which outlined the commission structure for RMS' footwear sales to retailers.

---

[1] Lucky Top, Inc. and John Doe Entities 1-10 were also sued in this action. However, these parties were previously dismissed by the Court. *See* [23]. Hey Dude is the sole remaining defendant.

Thereafter, Lucky Top merged with its parent company, Hey Dude, Inc.[2] Hey Dude, as successor-in-interest to Lucky Top, assumed Lucky Top's obligations to RMS under the SRA.[3]

The SRA provided that Hey Dude would pay RMS a variable commission between 1% and 8% on net sales (the "commission structure"). [75], Ex. 1 at p. 2-3. As was customary in the parties' industry, RMS' sales were in the form of customer orders, pre-booked for shipping several months in advance, with 2022 being the relevant time period. Most of RMS' customers were smaller independent stores with the exception of a couple of major retailers. Typically, once Hey Dude fulfilled the customer's order through shipment, the customer would then be invoiced for payment of the order.

The SRA provides that "[c]ommissions [to the sales representative] shall be paid upon payment of an Invoice by a customer on or before the 30th day of the month following the receipt of the funds." *Id.* at p. 2.[4] The SRA also provides that "[c]ommission shall not be paid in any case where a customer fails [to] pay within 120 days from an Invoice due date." *Id.*

On December 29, 2021, Lucky Top's then-CEO, Daniele Guidi, emailed a letter to all sales representatives, including RMS, informing them of the company's pending acquisition by Crocs, Inc. Guidi's letter stated that "we want to assure [the sales representatives] that all 2022 orders will still ship as planned, with guaranteed commissions per the 2022 commission structure. And 2022, Q4 bookings upcoming, will be included in that guarantee[,]" and to "continue 'business as usual' for a strong Q4 2022 booking." [75], Ex. 5 at p. 1. At his deposition, RMS' sole member and

---

[2] Crocs, Inc. acquired Lucky Top in early 2022. Hey Dude, Inc. was an entity formed to assume control and ownership of the Hey Dude brand upon the acquisition of Lucky Top by Crocs, Inc. Hey Dude, Inc. then became Lucky Top's parent company and the two entities later merged. The parties often refer to Crocs' acquisition of Lucky Top as the "merger" though it was the new entity, Hey Dude, Inc., which actually merged with Lucky Top. Again, Hey Dude, Inc. is the sole remaining defendant in this action.

[3] The parties do not dispute that the 2021 SRA is the operative sales contract between them for the time period in question.

[4] This payment arrangement is also referred to by the parties as "pay-on-pay."

representative, Ronnie Malatesta, testified that he understood this letter to "guarantee" his commission payment for the pre-booked orders even if the orders were not fulfilled by Hey Dude. In other words, he contends that the Guidi letter amended the terms of the SRA. On February 2, 2022, Hey Dude provided RMS with an Open Order Report summarizing RMS' pre-booked sale orders from January 1 to December 31, 2022.

Thereafter, on March 2, 2022, Hey Dude notified RMS of its intent to terminate the SRA effective April 1, 2022.[5] The SRA contains a provision governing termination of the agreement which states that "Any orders placed prior to termination shall be fulfilled by [Hey Dude], with commissions on such orders being paid according to sections 2.5 and 2.6." *Id.* Sections 2.5 and 2.6 encompass the commission structure and the pay-on-pay arrangement outlined above.

According to RMS, as of the date of termination, it had sale orders pre-booked for 2022 totaling more than $57 million for which Hey Dude owed it approximately $3.7 million in commission. Of this amount, RMS concedes that Hey Dude has paid it approximately $1.7 million for 2022 sales, but the remaining approximate $1.9 million is disputed.

Central to the dispute regarding commission in this case is the cancellation of a large percentage of RMS' 2022 pre-booked sale orders. Hey Dude did not fulfill the orders and, therefore, no customer payment was made to Hey Dude and subsequently no commission was paid to RMS.

RMS contends that Hey Dude cancelled and did not ship over $20 million of its 2022 sale orders in breach of the SRA. At her deposition, Hey Dude's former Sales Operation Manager, Margarita Stamper, when asked if Hey Dude customer service representatives reached out to

---

[5] The SRA allows either party to terminate the agreement upon thirty days written notice to the other party, "at any time, with or without cause." *Id.*, Ex. 1 at p. 4.

customers offering them an opportunity to cancel their order when the company encountered a "backlog" of orders after the acquisition, Stamper answered "Correct." [73], Ex. 8 at p. 9.

During discovery in this litigation, Hey Dude produced an order cancellation summary with respect to RMS' 2022 sales. The order cancellation summary provides reason "codes" to explain each order cancellation, including "Delivery to[o] late," "Customer request w/out replacement," "Customer cancel," "Shortage," "Operations request," "Legal reason," "Resold," and "Fill rate," among others. *See generally* [73], Ex. 12-15. For its part, Hey Dude largely attributes the cancellations to supply chain issues deriving from the COVID-19 pandemic, which hindered its ability to fulfill the orders. Though it contends the supply constraints were temporary, Hey Dude nonetheless relies on the SRA's provision that commission is payable upon receipt of payment by the customer, which never occurred with respect to the cancelled orders.

The SRA is silent with respect to order cancellations and does not expressly outline when commission is earned.[6] Malatesta testified that prior to December 2021, cancellations would occur occasionally but a large portion of the pre-booked orders were shipped. He also testified that, while there was no written cancellation policy, when cancellations did occur the sales representatives were provided an opportunity to resell the product of the cancelled order. Stamper testified that it was difficult for a customer to cancel an order prior to the Crocs acquisition. Stamper also confirmed the resale procedure as to cancelled orders testified to by Malatesta. She referred to this procedure as a "cancel policy prior to Crocs" during her deposition. *Id.*, Ex. 8 at p. 9.

In June 2022, Academy Sports + Outdoors ("Academy") became Hey Dude's customer. Academy was not a former RMS customer. During 2022, Hey Dude reported product sales and

---

[6] RMS argues that the SRA does not specify when commission is deemed "earned" as opposed to when it is payable (i.e. according to the pay-on-pay arrangement) and that there is a distinction between the two. On the other hand, Hey Dude appears to argue that commission is earned only if the customer pays the invoice.

shipments to Academy in an amount exceeding $10 million. RMS alleges that Hey Dude wrongfully diverted inventory to non-commissionable accounts—such as Academy—instead of fulfilling RMS' pre-booked orders in 2022. At her deposition, Katherine Wagner, Hey Dude's former Vice President of Sales, testified that it served "no purpose for Hey Dude to rob Peter to pay Paul in [that] scenario" [73], Ex. 7 at p. 23. However, she also testified that she would have to look at RMS' cancellation summary and the report of Academy's orders "line-by-line…and see if there's any correlation in there." *Id.* Relatedly, Cory Silveira, Vice President of Finance for Crocs, Inc. and the Rule 30(b)(6) representative of Hey Dude, testified at his deposition that shipments to Academy during 2022 "had absolutely no impact on the orders to RMS". *Id.*, Ex. 1 at p. 29. As to his reasoning for that statement, Silveira testified that "there is very little overlap in the products that shipped to Academy, if you look at a style level" and that Hey Dude would not proactively cancel orders because cancellations were costly for the company. *Id.*

Aggrieved,  RMS filed suit alleging that Hey Dude guaranteed the payment of commission on its 2022 pre-booked orders by virtue of the Guidi letter, and that it breached that "guarantee" and the SRA by failing to fulfill and pay commission on those orders. In its Motion for Summary Judgment [73], Hey Dude argues that all of RMS' claims should be dismissed because it has already paid all commissions due to RMS for 2022 pursuant to the SRA. RMS opposes the Motion [73].

Prior to filing its Motion for Summary Judgment [73], Hey Dude filed a Partial Motion to Dismiss [46] seeking dismissal of a portion of RMS' claims to the extent the claims are based on the alleged amendment to the 2021 SRA. RMS likewise opposes that Motion [46].

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

The Court will first consider Hey Dude's Motion for Summary Judgment [73], where the facts appear to be more fully developed, before turning to the Partial Motion to Dismiss [46].

6

As noted, RMS brings claims for breach of contract, failure to pay commissions, breach of the implied duty of good faith, and tortious breach of contract. The Court will address each claim in turn.[7]

### I. Breach of Contract

 "A breach-of-contract case has two elements: (1) 'the existence of a valid binding contract,' and (2) a showing 'that the defendant has broken, or breached it.'" *Maness v. K & A Enter. of Miss., LLC*, 250 So. 3d 402, 414 (Miss. 2018) (quoting *Bus. Commc'ns, Inc. v. Banks*, 90 So. 3d 1221, 1224 (Miss. 2012)). The parties do not dispute that the 2021 SRA was a valid binding contract between them. At issue are (1) whether the Guidi letter amended the terms of the 2021 SRA and, if so, whether it was breached and (2) whether Hey Dude otherwise breached the 2021 SRA.

### A. Guidi Letter

According to RMS, Hey Dude guaranteed the payment of commission on the pre-booked orders by virtue of the Guidi letter irrespective of customer payment.[8] This brings the Court to consider whether the Guidi letter is a valid modification of the SRA.

The SRA contains the two following provisions relevant to this issue:

> 3.2 Assignment and Amendments. Representative may not assign this Agreement. *This Agreement may not be amended by either party except by a written amendment executed by a duly authorized representative of each party.*
>
> …
>
> 3.7 Entire Agreement. Except as otherwise provided in this Agreement, this Agreement contains the entire understanding

---

[7] Mississippi law applies because this action is before the Court on the basis of diversity jurisdiction. *See, e.g.*, *Klocke v. Watson*, 936 F.3d 240, 244 (5th Cir. 2019) (citing *Hanna v. Plumer*, 380 U.S. 460, 465, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965)) ("The *Erie* line of authorities holds that substantive state law must be applied in federal courts in diversity cases[.]").

[8] In its briefing, RMS refers to this letter as the "Guidi Guarantee." *See* [76] at p. 3.

between the Parties, and there are no other agreements or understandings between the Parties with respect to this Agreement. *No amendment or modification to the Agreement shall be valid except by a subsequent written instrument executed by the Parties.*

[75], Ex. 1 at p. 4-5 (emphasis added).

Importantly, RMS does not argue that these provisions were *waived* by Hey Dude. However, in its Response Memorandum [76], RMS relies on *Eastline Corp. v. Marion Apartments, Ltd.* wherein the Mississippi Supreme Court held that "[a]n oral modification may be made even where the contract provides the modification must be in writing." 524 So. 2d 582, 584 (Miss. 1988). In *Eastline*, the issue before the court was "whether or not the parties waived the stipulation that all modifications be in writing." *Id.* Again, RMS does not make a waiver argument here, and its reliance on *Eastline* is therefore misplaced. Besides, the Guidi letter is unequivocally a written document and not an *oral* statement.[9]

On that point, RMS also argues that the Guidi letter "substantially satisfied the requirements of the Entire Agreement provision of the SRA ¶3.17 [sic]." [55] at p. 10. It is undisputed, however, that RMS did not at any time sign the Guidi letter, as the SRA requires for amendments. Acknowledging this fact, RMS argues that the requirement of its countersignature is not mandatory under Mississippi law. RMS relies on *Heritage Bldg. Prop., LLC v. Prime Income Asset Mgmt., Inc.*, 43 So. 3d 1138 (Miss. Ct. App. 2009) to support its position. In that case, the Mississippi Court of Appeals reversed the judgment of a chancery court upon finding that a signed amendment to a real estate contract was enforceable against the buyers despite the lack of signature

---

[9] RMS refers the Court to its analysis of *Eastline* contained in its supporting Memorandum [55] submitted in response to Defendant's Partial Motion to Dismiss [46]. In that Memorandum [55], RMS argued that Guidi made oral statements to the sales representatives similar to the contents of the December 29, 2021 letter during a meeting before the letter was sent out. *See* [55] at p. 9-10. However, it does not now point to any summary judgment-type evidence that supports that contention. Regardless, Malatesta (on behalf of RMS) testified that he only had one conversation with Guidi in December 2021 over the phone and the "terms of the letter" were not discussed. [73], Ex. 2 at p. 21, 29.

by two of the selling parties. *Id.* at 1146. The *Heritage* court was tasked with determining whether the unsigned amendment constituted a valid contract. *Id.* at 1143-44. Given the nature of the contract, the issue in *Heritage* specifically turned on whether the Statute of Frauds prevented enforcement of the amendment. *Id.* at 1145. However, *Heritage* is clearly distinguishable from the case at bar because it did not involve any requirement in the original contract for an amendment to be signed by each party, as is the case here. RMS attempts to analogize the two cases, but, candidly, the Court views this fact to be crucial in its present analysis. The Guidi letter was not "executed by a duly authorized representative of each party" and therefore does not meet the requirements of a valid amendment as dictated by the SRA's plain and unambiguous language governing amendments. [75], Ex. 1 at p. 4.[10]

Further, even if the Guidi letter met the signature requirement outlined in the SRA, it does not meet the requirements of a valid amendment pursuant to Mississippi law. In Mississippi, "[w]hen a subsequent agreement modifies a written contract, the 'agreement must be supported by new or additional consideration.'" *Papin v. Univ. of Mississippi Med. Ctr.*, 673 F. Supp. 3d 829, 840 (S.D. Miss. 2023) (quoting *Thompson v. First Am. Nat. Bank*, 19 So. 3d 784, 787 (Miss. Ct. App. 2009)). "A promise to fulfill a legal obligation or a preexisting duty under the original contract is not valid consideration for the new agreement." *Id.* (citing *Thompson*, 19 So. 3d at 787).

RMS argues that it provided consideration for the amendment in procuring pre-booked sales for 2022's fourth quarter and in forbearing its right to terminate the SRA. As to the earlier, it is undisputed that RMS' primary obligation under the SRA was to "use its best efforts to promote,

---

[10] Just as RMS does not argue that any portion of Sections 3.2 and 3.7 of the SRA were waived, it also does not argue that these particular terms of the contract are ambiguous. Absent any argument regarding ambiguity for the Court to consider, the Court must enforce the contract as written. *See Maness v. K & A Enters. of Mississippi, LLC*, 250 So. 3d 402, 410 (Miss. 2018) ("'It is a question of law for the court to determine whether a contract is ambiguous and, if not, enforce the contract as written.'") (quoting *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So.2d 748, 751 (Miss. 2003)).

solicit, and procure orders" for Hey Dude. [75], Ex. 1 at p. 1. The SRA was in effect from August 3, 2021 (the date it was signed) through the date of its termination on April 1, 2022. Malatesta testified that his deadline to book sales for 2022's fourth quarter was the end of January 2022, which is well before the SRA was terminated. *See* [73], Ex. 2 at p. 24-25. Accordingly, his continued performance in booking fourth-quarter sales constituted a preexisting duty under the SRA. *See Papin*, 673 F. Supp. 3d at 840. The Court rejects the notion that RMS' 2022 fourth-quarter sales were valid consideration to support an amendment to the SRA.

Finally, RMS' forbearance argument is easily rejected. In its Response Memorandum [76], RMS avers that "[t]he Guidi Guarantee clearly asks RMS to forbear from exercising its right to end the relationship." [76] at p. 19. The Court disagrees. There is nothing in the letter that can be interpreted to mean such nor does RMS point to any specific language in the letter to support this argument. Likewise, there was no testimony elicited from RMS as to any intent on its part to terminate the SRA and its supposed forbearance upon receipt of the Guidi letter. There is simply no evidence that supports RMS' argument in this regard. The Court finds that RMS provided no valid consideration for modification of the SRA.

For the reasons set forth above, the Court finds that the Guidi letter did not modify the terms of the SRA. Hey Dude's request for summary judgment is GRANTED as to any portion of RMS' claims dependent on a valid modification of the SRA by the Guidi letter.[11]

B. *2021 SRA*

The Court now turns to whether Hey Dude has breached the SRA. As noted previously, the SRA contains a termination provision as follows:

---

[11] Having considered a more developed record as to the amendment issue and finding that summary judgment is warranted as to the portion of RMS' claims based on such, Hey Dude's Partial Motion to Dismiss [46] is denied as MOOT.

2.14 Termination. Nothing contained in this Agreement shall restrict the right of either party to terminate this Agreement upon thirty (30) days written notice to the other party at the address provided herein or to such other address provided thereafter, at any time, with or without cause. Termination shall not affect Company's ownership of, and rights in, any Services performed prior to or in progress at the time of termination. *Any orders placed prior to termination shall be fulfilled by [Hey Dude], with commissions on such orders being paid according to sections 2.5 and 2.6.*

[75], Ex. 1 at p. 4 (emphasis added).

Section 2.6 of the SRA outlines the commission structure, including different commission percentages for net sales dependent on the sales representative's number of customer locations and amount of sales within a certain time period. *See id.* at p. 3. Section 2.5 discusses payment of commission:

2.5 Payment. The compensation terms are set forth as follows:

(a) As full compensation for Services and any and all rights granted or assigned to [Hey Dude] by Representative under this Agreement, Company will pay Representative in accordance to [sic] the commission structure in Section 2.6.

(b) Representative shall provide to its customers Invoices that account for all purchased Products.

(c) Commissions shall be paid upon payment of an Invoice by a customer on or before the 30th day of the month following the receipt of the funds.

(d) Commission shall not be paid in any case where a customer fails [to] pay within 120 days from an Invoice due date.

(e) Unless otherwise agreed, [Hey Dude] shall not reimburse Representative for any expenses and third-party costs associated with the Representative's services.

*Id.* at p. 2.

The parties do not dispute that RMS had a large number of sales orders placed prior to termination of the SRA, which Hey Dude did not fulfill through shipment because those orders were cancelled. Again, the SRA does not contain any provision governing order cancellations nor

11

does it expressly state when commission is earned. Therefore, the point of contention is whether shipment and customer payment were conditions to be satisfied for RMS to earn its commission payments.

In its Memorandum [74], Hey Dude appears to argue that no commission is owed on the cancelled orders because customer payment is a contingency to commission being earned. Hey Dude places emphasis on the portion of the termination provision that reads "with commissions on such orders being paid according to sections 2.5 and 2.6," which include the pay-on-pay arrangement in section 2.6(c). *Id.* at p. 4. Hey Dude relies on *Hamilton v. Hopkins*, 834 So. 2d 695, 702 (Miss. 2003) to support its position that if a contract provides for a contingency then there is no right to recovery unless that contingency is met or is excused.

In response, RMS argues that Hey Dude breached the agreement by failing to ship the cancelled orders as required by the termination provision and by failing to pay commission on those orders. Though it does not concede that order shipment and customer payment are contingencies on commission being earned, it argues that "Hey Dude cannot benefit from its decision to cause the failure of that condition by cancelling orders it was obliged to fill." [76] at p. 16. RMS relies on the "doctrine of prevention" which provides that "when a party to a contract causes the failure of the performance of an obligation due, [it] cannot in any way take advantage of that failure." *Dunn v. Agrisompo N. Am., Inc.*, 2024 WL 304086, at *8 (N.D. Miss. Jan. 26, 2024) (quoting Williston on Contracts, § 39.3 (4th Ed.)). Notably, Hey Dude does not address the doctrine of prevention in its briefing.

The Mississippi Supreme Court has held that "'[w]here a contract is performable on the occurrence of a future event, there is an implied agreement that neither party will place any obstacle in the way of the happening of such event, and where a party is [itself] the cause of the

12

failure he cannot rely on such condition to defeat his liability.'" *Garner v. Hickman*, 733 So. 2d 191, 195 (Miss. 1999) (quoting *Warwick v. Matheney*, 603 So. 2d 330, 337 (Miss. 1992), overruled on other grounds by *Bus. Commc'ns, Inc. v. Banks*, 90 So. 3d 1221 (Miss. 2012)). *Garner* involved a contractual dispute between a contractor, George Garner, and property owners, Lana and Russell Hickman. *Id.* at 192. There, the parties entered into a contract governing the construction of a new home within 90 days, which did not include a payment schedule for periodic payments to Garner. *Id.* The project was delayed longer than the time frame allotted in the contract, and the Hickmans refused to allow Garner to finish building the house for that reason in addition to citing workmanship concerns. *Id.* at 193-94. Garner then filed suit against the Hickmans for breach of contract, and the Hickmans were granted a directed verdict at trial. *Id.* at 195. Reversing the trial court's decision, the Mississippi Supreme Court explained that "[g]iven that there was no provision in the contract for a payment schedule, final payment could be construed as being predicated upon a future event, the timely completion of the house." *Id.* The court also explained that, because there was evidence presented at trial that the Hickmans locked Garner from the construction site and contributed to the project delay, there existed a jury question "of whether the Hickmans made it impossible for Garner to perform the contract" in order to receive his compensation. *Id.*

Here, the SRA does not explicitly provide that commission is earned upon customer payment but only that commission is *payable* to the sales representative upon customer payment. *See* [75], Ex. 1 at p. 4. Similar to the contract deficiencies in *Garner*, given that there is no provision in the SRA outlining when commission is earned, RMS' earned commission could be construed as being predicated upon a future event—the receipt of payment from the customer. The parties do agree that a portion of sales commission was paid to RMS in accordance with the pay-

on-pay arrangement after termination of the SRA.[12] However, the order cancellations at issue, on which the SRA is silent, remain at the center of the parties' dispute.

As to cancellations prior to December 2021 (prior to Hey Dude's acquisition of Lucky Top), Malatesta testified that cancellations were small in number and the sales representatives had the opportunity to resell the product. *See* [73], Ex. 2 at p. 12. Stamper, Hey Dude's former Sales Operation Manager, confirmed this cancellation procedure but also testified regarding how cancellations were handled after the company acquisition:

> Q. Do you know what the cancelation rate was for Mr. Malatesta's book of business for 2021, before the merger?[13]
>
> A. The specific rate? No.
>
> Q. Yeah.
>
> A. But we did have a, you know, cancel policy prior to Crocs, to where it would be very difficult to allow the customer to cancel. If they did have to cancel, then the sales rep would have to sell those goods within their territory. That way, we would not lose the revenue that was projected.
>
> Q. And then after -- after the merger as you -- as the company encountered this backlog, customer service was reaching out to those customers whose orders had not shipped and were maybe late, or going to be late, and offered them the opportunity to cancel?
>
> A. Correct.
>
> …
>
> Q. Do you know what the cancelation rate was on Mr. Malatesta's 2022 order book?
>
> A. I -- I don't know the exact rate.

---

[12] Malatesta testified that there was not a time after the SRA was terminated on April 1, 2022 that he did not get paid commission on an order shipped and customer paid. *See* [73], Ex. 2 at p. 35.

[13] The parties also refer to Crocs' acquisition of Lucky Top as the merger. Again, Hey Dude, Inc. was an entity formed to assume control and ownership of the Hey Dude brand when the acquisition occurred.

> Q.      Would approximately 35 percent sound accurate to you? In the ballpark?
>
> …
>
> A.      Oh. As a -- not just him, but all sales reps, the – the cancel rate was high.

*Id.*, Ex. 8 at p. 9.

Despite Hey Dude's variety of explanations for the cancelled orders, which included inventory shortages, this testimony illustrates that Hey Dude initiated the cancellation of some of RMS' 2022 pre-booked orders in contacting the customer. In discussing the cancellation reason codes on RMS' order cancellation summary, Wagner testified that there were some cancelled orders that may have been requested by the customer but stemmed from inventory shortage:

> Q.      Okay. The next is called "Shortage," and does that mean that there was -- there was not sufficient inventory to fill that particular order and it ran into its cancellation date and was canceled?
>
> A.      It doesn't necessarily mean it ran into its cancellation date, but yes, that there was a shortage, and there was lines on there we were unable to fulfill.
>
> Q.      Okay. So it wasn't based on customer request; there just weren't any goods to fill it?
>
> A.      No, not necessarily the case. And this is where -- it still may have been a customer request, but due to a shortage.

*Id.*, Ex. 7 at p. 19-20.

Based on the above testimony, it appears that Hey Dude contacted some customers to present them with the choice to cancel their order due to its own inventory shortage.[14] Silveira

---

[14] RMS' order cancellation summary is comprised of 352 pages of unnumbered entries. *See* [73], Ex. 12-15. In its Reply Memorandum [79], Hey Dude provides a chart summarizing the cancellation reason codes on RMS' order cancellation summary and their proportion to the total number of cancelled orders. *See* [79] at p. 8. Though the parties have not stipulated to the accuracy of that summary and the Court has not considered it as evidence, the Court does note that Hey Dude concedes that approximately 24.5% of the cancellations were due to late delivery, 20.8% due to customer's request without suitable product

(Vice President of Finance for Crocs, Inc. and representative of Hey Dude) testified that order cancellations directly affected RMS' commission:

> Q. Do you know of anything in this agreement that gives [Hey Dude] discretion to cancel an order?
>
> A. There's nothing addressed on that topic in this agreement.
>
> Q. And correspondingly, there's nothing in this agreement that says what happens to Ronnie Malatesta Sales' commission in the event that [Hey Dude] decides to cancel a purchase order?
>
> A. That's correct.
>
> Q. And so, if [Hey Dude] decides to cancel an order, it means it doesn't ship that order; correct?
>
> A. That would be correct.
>
> Q. And if it doesn't ship that order, the customer doesn't have an obligation to pay for it; do they?
>
> A. Of course not.
>
> Q. And if they don't -- if they don't pay for that order, it's the company's position that RMS is not entitled to commission?
>
> A. That's correct.

*Id.*, Ex. 1 at p. 8.

In evaluating the surrounding facts, and viewing this evidence in light most favorable to RMS, a reasonable jury could conclude that Hey Dude contributed to the customers' failure to pay RMS' 2022 pre-booked orders and that it "cannot [now] rely on such condition to defeat [its] liability." *Garner*, 733 So. 2d at 195. Resultantly, as was the case in *Garner*, a jury question exists

---

replacement, 16.8% due to customer cancellation, and 12.4% due to inventory shortage, among other reasons. Wagner testified that the cancellation entries were manually entered by Hey Dude's customer service "so you're relying on them, also, to classify this correctly, but this is manually done based on some kind of communication with the customer." *Id.* at p. 20. However, there was no evidence presented as to those customer communications.

as to whether Hey Dude made it impossible for the condition triggering RMS' commission payments to be met (i.e. product shipment in turn affecting timely customer payment).[15] For this reason, summary judgment is not appropriate on RMS' breach of contract claim pertaining to the 2021 SRA. Hey Dude's request in that regard is DENIED.

## II.    Good Faith and Fair Dealing

In Mississippi, "[a]ll contracts contain 'an implied covenant of good faith and fair dealing in performance and enforcement.'" *Caplinger v. Whitney Bank*, 293 So. 3d 307, 312 (Miss. Ct. App. 2020) (quoting *Univ. of S. Miss. v. Williams*, 891 So. 2d 160, 170 (Miss. 2004)) (additional citations omitted). "Good faith has been defined by courts as 'the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party.'" *Id.* (quoting *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992)). "Bad faith has been defined as requiring 'a showing of more than bad judgment or negligence;…bad faith implies some conscious wrongdoing because of dishonest purpose or moral obliquity.'" *Id.* (quoting *Williams*, 891 So. 2d at 170-71)).

RMS' expectation for fulfillment of its orders is at issue here. It argues that the evidence in this case "indicates that Hey Dude shipped inventory to Academy Sports that should [have] shipped to RMS['] customers who had placed 'planned' orders." [76] at p. 24. In response, Hey Dude argues that RMS' accusation is unfounded and denies diverting any inventory to fulfill Academy orders in 2022.

During her deposition, Stamper testified that Hey Dude had a fulfillment team that dealt with inventory allocation to different customer accounts. [73], Ex. 8 at p. 7. She also testified that Hey Dude considered Academy as a priority customer due to its designation as a major account:

---

[15] The Court also notes that Hey Dude does not claim in either of its briefs that the termination clause (obligating it to fulfill orders in place at the time of termination) was ambiguous.

> Q. In terms of [inventory] allocation, was -- was there any differentiation between major accounts and independents?
>
> A. Differentiation in how -- like, how do you mean?
>
> Q. In terms of one getting priority for inventory allocation over another.
>
> A. Yes. So major accounts had a lower -- like, a lower number priority, meaning that they would get service first versus the lower priority accounts.
>
> Q. Are you familiar with an account by the name of Academy Sports and Outdoors?
>
> A. Yes.
>
> Q. And after the merger, they became a customer of Hey Dude; correct?
>
> A. Correct.
>
> Q. And they are a major account?
>
> A. Correct.

*Id.* at p. 7.

As noted previously, the majority of RMS' customers were smaller independent stores with the exception of a couple of major retailers. *See id.* at p. 3 (Stamper testifying regarding RMS' customer account base). Stamper's testimony supports that Hey Dude classified Academy as a priority account and that the majority of RMS' customers were not considered priority. Hey Dude's allocation of available inventory between Academy and RMS's customers during the relevant time period is therefore material because of the fulfillment issue involved.[16]

---

[16] The parties each cite to Academy's order report; however, the portion of the report reflecting shipped orders to Academy does not contain any specific information on the style or color of the inventory shipped. *See* [75], Ex. 16 at p. 1-11. The Court is therefore unable to compare the inventory shipped to Academy to the inventory styles and colors on RMS' order cancellation summary. Nevertheless, the Court will determine whether there is an issue of material fact based on other evidence in the record.

Silveira testified that the approximate $10.5 million worth of goods shipped to Academy in 2022 were taken out of domestic stock. *See* [73], Ex. 1 at p. 27. When asked about the impact to RMS as a result of Hey Dude fulfilling Academy orders during 2022, he testified as follows:

> Q.  Can you tell me how, if at all, any shipments to Academy during 2022 would have affected any orders for RMS?
>
> A.  They would have had absolutely no impact on the orders to RMS.
>
> Q.  Why is that?
>
> A.  Because the -- twofold. One, there is very little overlap in the products that it [sic] was shipped to Academy, if you look at a style level.
> In addition, the company, by midyear, had significant excess inventory at that point. These cancels across all the accounts drove part of that, right, and these cancels were very costly for the company. It's not something we would have done proactively on our behalf. It was, ultimately, cancels that led to excess inventory, led to us having to then incur costs for storing inventory, and then, ultimately, having to liquidate that inventory at a steeper discount to other customers at a later time. So it's not anything we would have at any point incurred on our behalf proactively to cancel orders.

*Id.* at p. 29.

Although Silveira describes the inventory overlap as "very little," he is implicitly conceding that there was at least *some* overlap between the inventory shipped to Academy and the inventory that could have been allocated to some of RMS' orders. Viewing Silveira's testimony coupled with Stamper's testimony that Academy was a priority account for Hey Dude (as opposed to the majority of RMS' customer base) in light most favorable to RMS, a jury could find it "implies some conscious wrongdoing because of dishonest purpose or moral obliquity." *Caplinger*, 293 So. 3d at 312. Overall, there exists a jury question of whether Hey Dude diverted

the overlapping inventory from RMS' customers in order to satisfy its new priority customer—Academy. Summary judgment is DENIED as to this claim.

### III.    Tortious Breach of Contract

"'Tortious breach of contract requires, in addition to a breach of contract, some intentional wrong, insult, abuse, or negligence so gross as to constitute an independent tort.'" *Frye v. S. Farm Bureau Cas. Ins. Co.*, 915 So. 2d 486, 492 (Miss. Ct. App. 2005) (quoting *Braidfoot v. William Carey College*, 793 So. 2d 642, 655 (Miss. Ct. App. 2000)). Where there has been no breach of contract, there can be no tortious breach of contract. *Braidfoot*, 793 So. 2d at 655.

As to this claim, the parties' arguments overlap with their arguments regarding the breach of contract and bad faith claims. The Court has already addressed each claim extensively above. Regarding the requirement that a breach of the SRA be shown, the Court has found that questions of material fact remain for the jury to resolve on that claim. Additionally, the question of fact regarding inventory diversion is equally applicable here as that act could be considered by a jury as an "intentional wrong" as required to prove the tortious breach of contract claim. *Frye*, 915 So. 2d at 492. Accordingly, summary judgment as to this claim is likewise inappropriate and hereby DENIED.

### IV.    Miss. Code Ann. § 75-87-5

Finally, RMS brings a claim for failure to pay commission under Mississippi statutory law. In Mississippi, "[w]henever any principal enters into an oral or written contract with a sales representative *for services to be rendered within this state* and the contemplated method of compensation of the sales representative involves a commission, the contract shall set forth the means by which the commission shall be computed and paid." MISS. CODE ANN. § 75-87-3 (emphasis added). The parties do not dispute that RMS' compensation is on a commission basis

20

and that the SRA outlines how such commission is to be computed and paid. However, the Court notes that the statute appears to apply to contracts for "services to be rendered within [Mississippi]." *Id.*

The parties focus their respective arguments on the portion of the statute providing that "[w]henever the contract between a sales representative and any principal is terminated, all commissions due [to] the sales representative by the principal shall be due and payable within twenty-one (21) days of such termination." MISS. CODE ANN. § 75-87-5. However, though neither party raises the issue, RMS provided services to Hey Dude within a limited territory—not including Mississippi. *See* [75], Ex. 1 at p. 7. The SRA provides that RMS would "promote, solicit, and procure orders for [Hey Dude's] Products *within its Territory*…" [75], Ex. 1 at p. 1 (emphasis added). The SRA also provides a description for the scope of RMS' representation of Hey Dude to customers which includes "the exclusive right to represent [Hey Dude] in the specific territory defined in Section 1.3 in connection with all sales, Trade Shows…, and services described in Section 1.4." *Id.* Nothing in the SRA provides that RMS was obligated to provide services for Hey Dude within Mississippi nor was there any evidence presented that would support such was the case.[17] Accordingly, Miss. Code. Ann § 75-87-1, *et seq*. appears to be inapplicable to the parties' dispute over commission in this case.

Pursuant to Rule 56(f), the Court may, after giving notice and a reasonable time to respond, consider summary judgment on grounds not raised by a party. FED. R. CIV. P. 56(f)(2). All parties are hereby on notice of the Court's intent to consider summary judgment on the inapplicability of Miss. Code Ann. § 75-87-1, *et seq*. The parties may file a response within 7 days from the date of this order fully articulating their respective positions as to the applicability of those statutory

---

[17] Malatesta testified that he has an office in Clarksdale, Mississippi, but denied ever selling any product from any brick and mortar office. *See* [73], Ex. 2 at p. 4.

21

provisions. The Court will thereafter consider Hey Dude's summary judgment request as to that claim.

*Conclusion*

For the reasons set forth above, Hey Dude's Motion for Summary Judgment [73] is GRANED IN PART, DENIED IN PART, and HELD IN ABEYANANCE IN PART. The parties shall submit additional briefing in accordance with the directive set forth above.

Hey Dude's Partial Motion to Dismiss [46] is denied as MOOT.

SO ORDERED, this the 30th day of April, 2025.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE